Noel C. TRUDEAU, Appellee,

v.

Donald WYRICK, Warden, Missouri
State Penitentiary, Appellant,

Security Insurance Co. of Hartford.

Noel C. TRUDEAU, Appellant,

v.

Donald WYRICK, Warden, Missouri State
Penitentiary and Security Insurance Co.
of Hartford, Appellees.

Nos. 82–1817, 82–2198.

United States Court of Appeals,
Eighth Circuit.

Submitted April 12, 1983.

Decided Aug. 5, 1983.

Rehearing and Rehearing En Banc
Denied Oct. 20, 1983.

John Ashcroft, Atty. Gen., Robert L. Presson, Asst. Atty. Gen., Jefferson City, Mo., for David Wyrick.

Tom Mendelson, University City, Mo., for Noel C. Trudeau.

C. Christy Barton, Jefferson City, Mo., Francis L. Kenney, Jr., St. Louis, Mo., for appellee, Security Ins. Co. of Hartford.

Before ARNOLD and BENNETT,* Circuit Judges, and HENLEY, Senior Circuit Judge.

ARNOLD, Circuit Judge.

Noel C. Trudeau, a Texas resident, filed this action in the District Court[1] against Donald Wyrick, who is Warden of the Missouri State Penitentiary for Men, and Security Insurance Company of Hartford, which provided the Warden's surety bond. The complaint, which was based on Section 1983 of Title 42 and which also asserted a claim based on state law, invoked both the court's diversity jurisdiction under 28 U.S.C. § 1332 and its civil rights jurisdiction under 28 U.S.C. § 1343(3). The plaintiff's case is based on the theory that the Warden's interference with his letter to an inmate violated the First Amendment and was the proximate cause of plaintiff's losing his job. The jury awarded the plaintiff $25,001 in damages. Although the chain of circumstances involved in this case was, to say the least, unusual, we agree with the District Court that the evidence was sufficient to create a jury question. We therefore affirm the judgment entered on the jury verdict. We vacate the court's dismissal of Security Insurance Company after trial, and remand for further proceedings as to the defendant surety.

## I.

This story begins in November of 1976 on the campus of the University of Texas at Arlington. The plaintiff Trudeau was a student at the University and was serving the University Catholic Community (UCC) as a lay associate minister. In addition to his formal duties with the church, he was active in the local chapter of Dignity,[2] an organization of Roman Catholics who are gay. Through Dignity, Trudeau received a letter from one Robert Johnson, an inmate in the Missouri State Penitentiary (MSP), indicating that Johnson wished to participate in Dignity's pen-pal program, a part of the organization's prison ministry. Trudeau was president of the Dignity chapter, and he elected to respond to Johnson's letter personally. Johnson then wrote to Trudeau again. The contents of this letter from Johnson, which is not in the record, apparently aroused some suspicion on Trudeau's part as to the legitimacy of the prisoner's representations about himself.[3] Because of this concern, Trudeau wrote to Warden Wyrick on December 7, 1976, requesting information about Johnson. On December 8, 1976, Trudeau, apparently somewhat remorseful about doubting Johnson, determined to write to the inmate again before hearing from the Warden. He enclosed a money order for $3.00 as a Christmas gift. It is the fate of this letter of December 8 which forms the basis of this lawsuit.

The fact of the matter, as later revealed in Warden Wyrick's reply to Trudeau, was that Johnson's letters to Dignity were part of a fraudulent scheme by the inmate to get money out of people who were likely to be sympathetic. The story he told varied with the audience. In Trudeau's case, Johnson described himself as a young man who was gay and lonely and who was serving five years for possession of marijuana. He said that he needed a friend, and could also use

---

* The Hon. Marion T. Bennett, United States Circuit Judge for the Federal Circuit, sitting by designation.

1. The Hon. Scott O. Wright, United States District Judge for the Western District of Missouri.

2. This organization, which is international in scope, is not officially recognized by the institutional church. It seeks to provide support and

understanding for its members and to broaden theological acceptance of homosexuality within the church. Brief for Appellee at 4.

3. Johnson said, among other things, that he had no family on the outside and that he was serving five years for possession of marijuana.

some money. In fact, Johnson was a murderer serving a life sentence and was suspected of involvement in the murder of a prison guard. Warden Wyrick had been alerted to the scheme by a previous letter written by Johnson to a Dignity chapter in Baton Rouge. Wyrick responded by ordering that all of Johnson's mail be diverted to his office where it was screened by a stenographer, Mrs. Moody.

Trudeau's December 8 letter to Johnson attracted attention because it contained money which the Warden thought, because of Trudeau's previous letter, was a response to the fraudulent scheme. The money, Wyrick felt, should be returned to Trudeau. He assigned the task of returning Trudeau's letter and money to one of the prison's chaplains, Father Wheeler, but did not give the chaplain specific instructions, simply telling Mrs. Moody to have Father Wheeler "handle it." At this point, the facts of the case become somewhat bizarre.

Although we regret shedding more publicity on the contents of this essentially private correspondence than has already occurred, some knowledge of what was said is essential to understand Father Wheeler's actions. Trudeau acknowledged in the letter that he was gay and said that both his priest and his bishop were aware of his homosexuality. Moreover, he made some comments about the bishop's supposed " 'life or death' hold over the people and priests in his diocese." Plaintiff's Exhibit (PX) 3 at 2. In addition to this letter and the money order, Father Wheeler was also given Trudeau's earlier letter to Wyrick and a copy of the Warden's response.[4] Rather than simply returning the correspondence and money order to Trudeau, Father Wheeler chose to approach the problem through official church channels. He wrote to the chancellor of the Diocese of Fort Worth, Monsignor Eugene Witkowski, enclosing Trudeau's letter to Johnson and the money order. Through the Monsignor, the entire matter came to the attention of the episcopal head of the diocese, Bishop John J. Cassata. The Bishop was not pleased.[5] He ordered that Trudeau must leave his position at UCC, or else he would remove UCC's priest, Father Scholl. Trudeau was employed at UCC under a year-to-year contract which provided, essentially, for automatic renewal absent notice or just cause for removal.[6] He eventually acceded to the Bishop's demand and resigned as of the end of the academic year.

## II.

Trudeau filed this suit in the District Court alleging that Wyrick's actions constituted censorship in violation of the free speech clause of the First Amendment to the Constitution, and also that these actions amounted to a tortious invasion of privacy under Missouri law. After a full trial on both claims, the Court directed a verdict for the defendant on the state law claim[7] and submitted the constitutional claim to the jury. The six-member jury returned a verdict for Trudeau for one dollar in nominal damages and $25,000 in actual damages. They declined to award punitive damages.

The defendant's first argument on appeal is that the facts are simply insufficient to support the jury's verdict. Both sides rely on *Procunier v. Martinez*, 416 U.S.

---

4. The letter to Wyrick was on the letterhead of the UCC, which reflected Trudeau's official capacity as an "associate minister" in the church.

5. It is unclear whether the Bishop's ire was more aroused by Trudeau's admitted homosexuality or by his comments about the Bishop's "life and death" power over priests and the church.

6. There is no question that Father Scholl knew of Trudeau's homosexuality and believed that it

was irrelevant to Trudeau's continued employment at UCC.

7. Trudeau has filed a cross-appeal from this decision, but he asks that it be considered only in the event that the jury's verdict on the federal claim is reversed or reduced. In view of our disposition of the appeal, consideration of the cross-appeal is unnecessary.

396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). In *Procunier* the Supreme Court addressed the constitutionality of California prison mail regulations which had been invalidated by a three-judge district court on the grounds of vagueness, censorship of constitutionally protected speech, and failure to provide procedural safeguards. The Supreme Court affirmed the holding of unconstitutionality. 416 U.S. at 415, 94 S.Ct. at 1812. The premise of the holding is clear: "[i]n the case of direct personal correspondence between inmates and those who have a particularized interest in communicating with them, [footnote omitted] mail censorship implicates more than the right of prisoners." *Id.* at 408, 94 S.Ct. at 1809. Justice Powell's opinion for the Court described the legal interests at stake in this way:

> Communication by letter is not accomplished by the act of writing words on paper. Rather, it is effected only when the letter is read by the addressee. Both parties to the correspondence have an interest in securing that result, and censorship of the communication between them necessarily impinges on the interest of each. Whatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech. And this does not depend on whether the nonprisoner correspondent is the author or intended recipient of a particular letter, for the addressee as well as the sender of direct personal correspondence derives from the First and Fourteenth Amendments a protection against unjustified governmental interference with the intended communication.

*Id.* at 408–09, 94 S.Ct. at 1809. Thus it is clear that the sender of a letter to an inmate has a right, grounded in the Constitution, to have that letter delivered to the inmate free of unjustified interference by state officials.

■ It should be noted, however, that the opinion in *Procunier* dealt primarily with the facial validity of regulations promulgated for a correctional institution. This case, on the other hand, deals with a single instance in which mail was diverted from the normal course of delivery and sent to a third party who had no colorable legal interest in the letter. The validity of the prison's regulation on the subject of censorship is not at issue. It provided simply, "Incoming mail will not be read." PX 11(a) at 2, PX 11(b) at 2. No one doubts that this regulation meets or exceeds the requirement established in *Procunier*, which held that a

> regulation authorizing mail censorship [must] further[ ] one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved.

416 U.S. at 413, 94 S.Ct. at 1811.

The District Court incorporated this balancing test in its instructions numbered 10 and 12, setting forth the elements which the plaintiff must prove in order to establish his cause of action:

Instruction No. 10

Your verdict must be for plaintiff if you believe:

First, that defendant knowingly rejected a letter written by the plaintiff to an inmate at the Missouri State Penitentiary, and,

Second, that the rejection of the letter was without just cause, and,

Third, that defendant's acts deprived plaintiff of his First Amendment rights to freedom of speech, as defined and explained in these instructions.

Instruction No. 12

The First Amendment to the United States Constitution guarantees individuals the right of freedom of speech. This right includes the ability to correspond with inmates at correctional institutions

and forbids the censorship or refusal to deliver such mail based on the content of the correspondence, unless justified by the interests which the state has in preserving the internal order, discipline and security of the correctional institution, as well as promoting the rehabilitation of the inmates. The law recognizes that a correctional official may refuse to deliver mail relating to proposed criminal activities, whether within or without the institution.

Tr. 225–26. Thus, the law applied to determine the validity of the Warden's decision to withhold delivery of a single piece of mail was the same as that used in *Procunier* to gauge the constitutionality of formal rules on censorship of prison mail.

While the giving of these instructions cannot be said to be error, we think they state only one of two bases established in *Procunier* on which the Warden could have been found liable to the plaintiff. The District Court in *Procunier* had required by injunction "that the decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards." 416 U.S. at 417, 94 S.Ct. at 1814. In affirming this requirement, the Supreme Court reasoned that "[t]he interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a 'liberty' interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstance of imprisonment." *Id.* at 418, 94 S.Ct. at 1814. The Court expressly affirmed the specific procedural safeguard formulated by the District Court, "that an inmate be notified of the rejection of a letter written by or addressed to him, that

the author of that letter be given a reasonable opportunity to protest that decision, and that complaints be referred to a prison official other than the person who originally disapproved the correspondence." *Id.* at 418–19, 94 S.Ct. at 1814.[8] We think, therefore, that instructions on the question of liability under the circumstances of this case would properly have drawn from this language from *Procunier* in addition to, or perhaps in lieu of, instructions 10 and 12.[9]

The failure to give such an instruction was, however, harmless error so far as defendant is concerned. This is so because the undisputed testimony as to what Warden Wyrick did with the plaintiff's letter showed that neither the author nor the intended recipient was afforded any procedural protection whatsoever. Warden Wyrick simply turned the letter and money order over to Father Wheeler, through Mrs. Moody, with no specific instructions to either as to how the situation should be handled. Tr. 102–103. It does not appear that any thought was given to the idea of giving either the plaintiff or inmate Johnson an opportunity to be heard as to why the letter and money were being rejected. It is possible, though improbable, that Trudeau would have wanted the letter and money order delivered to Johnson in spite of the fraud. In any event, it is certain that, had Trudeau had any say in this matter, he would not have approved sending this obviously private letter to Monsignor Witkowski. Under this view of the law, the plaintiff would have been entitled to a directed verdict on the question of liability. It was, therefore, harmless error to give the jury an instruction which resulted in a verdict for the plaintiff under a different standard.[10]

In addition, we think that the verdict can properly be upheld on the basis of the in-

---

**8.** Although it is possible that the Court might approve some alternative procedure for safeguarding these rights, we believe that the procedure approved in *Procunier* is controlling in this case.

**9.** This omission in the instructions was called to the District Court's attention by plaintiff's counsel at the instruction conference. Tr. 183.

**10.** Obviously, the application of a somewhat different standard of liability which would produce the same result on that issue has no bearing on the jury's finding of $25,000 in actual or compensatory damages. Neither do we think it would have affected the jury's finding that no punitive damages were warranted.

structions actually given. The jury must have found that Wyrick rejected the letter without "just cause," and that his subsequent handling of the letter was not "justified by the interests which the state has in preserving the internal order, discipline and security of the correctional institution," to use the words of the instructions. We assume, as Wyrick argues, that he had a right, so far as the First Amendment is concerned, to read and intercept the letter on the theory that it related to Johnson's suspected attempts to obtain money by fraud. *Procunier* requires, however, more than that. "[T]he limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." 416 U.S. at 413, 94 S.Ct. at 1811. Here, once the letter had been stopped, Johnson had been deprived of the fruits of his fraud. The state's interest was fully satisfied. There was no need whatever for anyone else to see the letter, or for anything to be done with it other than sending it directly back to Trudeau. Yet, as we have seen, far more than that, with disastrous consequences for plaintiff, took place.[11]

The defendant asserts that his failure to deliver the letter was simply not an act of censorship within the meaning of *Procunier.* He reads that case as directed at censorship which is based on the *content* of the communication, and denies what Trudeau said had anything to do with his decision. The answer to this argument is that it simply overlooks the procedural requirements of *Procunier,* which have nothing to do with content. In addition, the Warden's own testimony shows that he turned the letter over to Father Wheeler precisely because of its content. "The letter contained certain statements involving the Catholic Church.... And for that reason I asked her to give it to the Catholic chaplain, Father Wheeler, to handle rather than me." Tr. 118.

## III.

### A.

■ This interpretation of *Procunier*'s application to this case aids our consideration of Wyrick's second argument on appeal, that the District Court erred in refusing to give his proffered instruction on *respondeat superior.* Wyrick says he merely wanted the jury to know that vicarious liability is not available as a basis of liability under § 1983, a proposition with which no one disagrees. *E.g., Cotton v. Hutto,* 577 F.2d 453, 455 (8th Cir.1978) (per curiam). He urges that if anyone was at fault in this unfortunate situation, it was Father Wheeler, and that his actions should not be imputed to the Warden. The problem with the proffered instruction, however, is that *respondeat superior* was neither pleaded nor argued by the plaintiff as a basis of liability for Warden Wyrick. The defense "no *respondeat superior*" is irrelevant where *respondeat superior* is not alleged as a basis of liability. Warden Wyrick's argument on this point is really about proximate causation. The gist of his position is that Father Wheeler's actions were so unforeseeable to the Warden as to amount to an intervening cause that would break the chain of liability. The question of proximate cause is, however, normally one for the jury. In this case the defendant did not object to the court's instruction on proximate cause, and he had every opportunity to argue this issue to the jury, which resolved the question against him.

■ In addition, we think it important to point out the bearing which the procedural requirements of *Procunier* have on this contention. As explained above, the Warden's duty under *Procunier* was to give some form of notice to the author and to the intended recipient that delivery of the letter was being upheld, and then to refer the question to an impartial third party for

---

11. The District Court, immediately before denying Wyrick's motion for directed verdict, summed up the case succinctly: "I don't blame

them for reading it. Of course, one thing I don't know [is] why they just didn't send the letter back to Trudeau." Tr. 178.

resolution. It was Wyrick, not Father Wheeler, who made the decision to reject the letter without any notice to the correspondents. If Wyrick intended for Father Wheeler to serve as the third party who would resolve any dispute raised by the correspondents after notice (and there is no suggestion of this in the record), he should have given explicit instructions as to procedures to be followed in notifying the parties. It is clear that a defendant may be found liable under § 1983 for failure to supervise subordinates. Thus, two substantial reasons exist for upholding the liability of Warden Wyrick for what happened to the plaintiff. He either independently made the decision not to follow the notice requirements of *Procunier*, or else he utterly failed to supervise or instruct Father Wheeler in carrying out his instructions if he intended that the *Procunier* procedure be followed. Whichever of these one prefers to believe, the proximate result was Father Wheeler's decision to publish the contents of this private letter to a third party who should have had no connection whatsoever with it.

Some might view Father Wheeler's actions as unforeseeable or as an intervening cause. The answer is that the question is not so free from doubt as to justify taking it from the jury. And the jury could reasonably have found that some harm to the plaintiff was the likely outcome of Warden Wyrick's handling the letter as he did. Additionally, under the Missouri law of proximate causation, to which we may look in applying § 1983, it is enough that the defendant's fault was a "substantial factor" in producing the plaintiff's injuries, and the defendant's fault need not have been the *sole* proximate cause in order to allow recovery. *Morrow v. Greyhound Lines, Inc.,* 541 F.2d 713, 718 (8th Cir.1976).

**B.**

Warden Wyrick raises two additional issues which he groups together as one, but which seem to us separate and distinct. First, he argues the plaintiff should not have been allowed to introduce two regulations of the Corrections Department and the prison which prohibit the reading of incoming mail.[12] Wyrick argues that the violation of state administrative regulations cannot alone establish a cause of action under § 1983. The regulations in question were not, however, admitted for the purpose of defining a liberty or property interest or creating a cause of action, and the District Court did not so instruct the jury. Rather the regulations were appropriate to show the defendant's intent as it bore on the question of punitive damages. One of the questions the jury had to decide, moreover, was whether Wyrick's rejection of the letter was justified by some important state interest. The regulations arguably are the state's own definition of its interest in intercepting inmate mail, and if Wyrick's interference with Trudeau's correspondence went beyond the regulations (as it unquestionably did), then the argument that defendant's action was justified by some interest of the State of Missouri is to that extent weakened. We see no error in the admission of these regulations.

Warden Wyrick also argues that the District Court erred in its response to a question from the jury during their deliberations. The question, which was the sixth submitted by the jurors during the course of the afternoon, read as follows: "With regard to Instruction No. 10, does the word rejection mean that the letter is not to be given to the prisoner or does it mean the letter will not be received, i.e., returned to the sender unread?" Tr. 241. The Court answered the question in this fashion: "I

---

12. The regulations, quoted in part *ante* at p. 1364, also provide that "incoming mail will be opened for inspection for contraband, and for money orders, checks or currency to be placed on the inmate's account. If in the opinion of the Warden or Superintendent, or his desig-

nate, it is necessary to reject an incoming letter because it contains contraband, the inmate to whom the letter is addressed will be notified by written memo of the rejection and the reason therefor." PX 11(a) at 3, PX 11(b) at 2.

cannot define for you any of the words in the instructions and you must be guided by the instruction and the evidence and make your own determination." Tr. 245. The defendant argued to the District Court that the phrase "and make your own determination" invited the jury to speculate and determine the law for itself. That court found the argument without merit, and we agree. The instructions as a whole made clear that the jury was bound by the court's explanation of the law.

■■■ The defendant further argues that these two supposed errors taken together invited the jury to find liability based merely on the fact that the letter was read. We agree that the Warden may have been within his rights in reading the letter, given the fact that he was alerted to a possible mail-fraud scheme in progress. Under the view we have taken of the case, however, the Warden should properly have been found liable based on his omission to accord any notice or process to the plaintiff, and his failure to supervise properly the return of the letter to its sender. The reading and even censorship of an inmate's personal correspondence is a limitation on the First Amendment freedoms of both parties to the correspondence which is made tolerable only under the limitations set out in *Procunier,* 416 U.S. at 413–14, 94 S.Ct. at 1811. But the publication of such correspondence to a third party, a stranger to the transaction, is not required by any reasonable interest of the state.

### C.

■■■ Finally, the defendant argues that the jury's verdict of $25,000 in actual damages is excessive and unsupported by the evidence. In fact, the evidence showed that the plaintiff dropped his classes for the following semester and never finished his degree program, even though he was only some thirty hours short of completion at the time the incident occurred. In addition, he lost his job with UCC, which paid him $750 per month when he left in July 1977. During the next several months the plaintiff attempted to establish a retail business using money borrowed from his father and brother. This business failed after about six months. For some months thereafter the plaintiff made his way by performing odd jobs which generally earned him less than $500 per month. In October 1978 Trudeau began what is apparently his present job with an audio-visual sales and rental company. He now earns substantially more than he did with UCC. Perhaps more importantly, however, both the plaintiff and Father Scholl, his priest, testified that in the period after leaving UCC, Trudeau was often severely depressed and suffered considerable emotional anguish, including alienation from his religious faith. Father Scholl indicated that Trudeau still seems to suffer emotional pain from the incident on occasion. Under these circumstances, we do not find the award to be a " 'plain injustice' or a 'monstrous' or 'shocking' result," *Taken Alive v. Litzau,* 551 F.2d 196, 198 (8th Cir.1977), so as to justify disturbing the jury's judgment.

### IV.

■■■ Finally, Trudeau has filed a separate appeal, No. 82–2198, from the District Court's post-trial order which dismissed Security Insurance Company of Hartford as a defendant. Because we do not know the court's reasons for the dismissal, we vacate this order and remand for findings of fact and conclusions of law on this point. It seems that Security, which was the Warden's surety and which was named as a defendant under a Missouri procedure about which no one now complains, had stipulated to be bound by the jury's verdict against the Warden in exchange for severance from those proceedings. Frankly, we are at a loss to understand why judgment cannot now be entered on the pleadings against

Security,[13] but we realize that there may be questions of coverage or other issues of Missouri insurance law about which we are not fully informed. We therefore vacate the dismissal and remand the cause for the District Court to set forth its reasons for dismissing the insurance company, or to enter such other judgment as may be appropriate.

As noted earlier, *ante* at n. 7, the plaintiff has filed a conditional cross-appeal from the District Court's directed verdict for the defendant as to the invasion-of-privacy claim under Missouri law. He asks that this claim be considered only in the event the jury's verdict is reversed or reduced. Because we have done neither, the cross-appeal is dismissed as moot.

The judgment in No. 82–1817 is affirmed, and the cross-appeal is dismissed as moot. The judgment in No. 82–2198 is vacated and remanded with instructions.

It is so ordered.

HENLEY, Senior Circuit Judge, dissenting.

I can agree with the court that the facts with which we deal are unusual and share its regret in shedding more publicity on essentially private correspondence. I can agree that as to Security Insurance Company the judgment of the district court should be vacated for further proceedings.

However, I cannot find support for the jury's verdict based on the instructions given; nor can I uphold the verdict and judgment on the basis of a theory not submitted to the jury.

The issues are somewhat complex and in large part they have been blurred rather than delineated by pleading, trial and submission. Thus, it is necessary to identify the true bases of the controversy. First, we should distinguish the Warden's interception of the letter in question from the Warden's disclosure of that letter.

Although the disclosure was part of the sequence of events from which this case arose, it did not necessarily follow from the Warden's failure to deliver the letter to Johnson. Had the Warden examined the letter and either delivered it to Johnson or returned it directly to plaintiff with no disclosure of the contents, it is highly unlikely that plaintiff could or would have objected. Clearly, it is the sequence of events subsequent to disclosure of the letter to Father Wheeler, if anything, that has resulted in injury to plaintiff. However, no theory of liability based on the Warden's disclosure of the letter was properly submitted to the jury.[1] Indeed, only one theory of liability was submitted—that is, that plaintiff's first amendment rights were violated by the Warden's alleged unjustified "rejection" of the letter.

The term "rejection" was confusing to the jury and was inadequately explained by the trial judge. Nevertheless, according to any interpretation of the term as it is generally understood, and under either definition contemplated by the jury's question to the court, the term reasonably can be understood as referring only to the Warden's interception of the letter and not to his disclosure of the letter to Father Wheeler. This conclusion is further supported by reference to Instruction 12 which discusses the first amendment rights involved in terms of freedom to correspond without unjustified censorship and recognizes "that a correc-

13. Security argues that it is not liable to the plaintiff because there is no doctrine of *respondeat superior* in § 1983 jurisprudence, and it did not directly participate in any wrong inflicted on the plaintiff. This is the first time, to our knowledge, that a surety has suggested that its liability is based on notions of tort rather than contract. The point is without merit.

Security also argues that the American Civil Liberties Union, under the terms of its corporate charter, was never intended to file lawsuits such as this. The argument, as best we can tell, was not raised in the District Court, and in any event is irrelevant to Trudeau's claim against Wyrick.

1. In part, counsel for plaintiff did attempt to argue disclosure, particularly with respect to damages.

tional official may refuse to deliver mail relating to proposed criminal activities."

I am convinced that the Warden's interception of plaintiff's letter, given the circumstances of Johnson's fraud scheme and plaintiff's earlier letter to the Warden, was well within the bounds of *Procunier* and the first amendment.[2]

Moreover, the evidence does not support the finding that plaintiff's injuries were proximately caused by the Warden's interception. As stated, plaintiff was injured, if at all, as a result of the disclosure of the letter's contents, but the first amendment implications of this aspect of the Warden's conduct were simply not reflected in the verdict director, Instruction 10. Thus, I am unable to uphold the jury's verdict based on the instructions given.

The court obviously has problems with the standards under which the case was submitted to the jury, but upholds the verdict because it finds a theory of liability upon which the jury, if properly instructed, might have found liability and assumes the findings as to damages would have been the same. Such a utilitarian approach to the law is completely unacceptable to me. In another context, but in words applicable here, it has been said that this is a fox-hunting theory of justice that would make Jeremy Bentham's bones rattle.

Even if I could agree that a jury could have found a minimal violation of procedural due process under *Procunier,* it does not follow that "a different standard of liability has no bearing on the jury's finding of $25,000 in ... damages" because plaintiff has not shown conclusively that he suffered injury as a result of the denial of due process itself as opposed to the alleged denial of substantive first amendment rights. See *Carey v. Piphus,* 435 U.S. 247, 260–64,

98 S.Ct. 1042, 1050–52, 55 L.Ed.2d 252 (1978). In other words, the disclosure of the contents of the letter and the following injury to plaintiff would not necessarily have been avoided by the Warden's strict adherence to the procedures approved in *Procunier,* and it cannot be assumed that under another theory the jury would have found for plaintiff or that if it did so find the award would have been in the same amount.

Having concluded that the jury's verdict cannot be upheld on the basis of the instructions given, or on the alternative theory relied on by the majority, the question becomes the appropriate disposition. Although I am somewhat disturbed that plaintiff may have suffered as a result of the disclosure, I have little sympathy for plaintiff's failure to present a well-reasoned theory of relief to the court. The first amendment claim was stated by plaintiff in such a way that the jury, in my opinion, could not have found for plaintiff. Moreover, plaintiff failed to follow through on the fourth amendment claim asserted in the complaint, cf. *United States v. Baumgarten,* 517 F.2d 1020, 1028 (8th Cir.), *cert. denied,* 423 U.S. 878, 96 S.Ct. 152, 46 L.Ed.2d 111 (1975) (fourth amendment implicated by Warden's dissemination of contents of letter); *Pollard v. Roberts,* 283 F.Supp. 248, 256 (E.D.Ark.), *aff'd,* 393 U.S. 14, 89 S.Ct. 47, 21 L.Ed.2d 14 (1968) (fourth amendment extends to "orderly taking under compulsion of process"), and although plaintiff asserted a state claim for invasion of privacy, the pertinent requested instruction did not set forth the elements of the claim as outlined in *Corcoran v. Southwestern Bell Telephone Co.,* 572 S.W.2d 212 (Mo.App.1978). Nor did plaintiff pursue other state claims that might be available, such as tortious interference with business relations.

---

**2.** The parties seem to have agreed specifically that the correction officials could read the letter and that there was no violation of first amendment rights based on the reading of the letter. (Tr. 199.) Thus, under Instructions 10 and 12, plaintiff was not entitled to have a jury verdict since No. 10, the verdict director, required a finding that rejection of the letter (which the jury was permitted to interpret as failure to deliver or return unread) was without just cause.

On the other hand, the district court failed to instruct the jury adequately on plaintiff's first amendment claim, both initially and after the jury requested further guidance concerning the term "rejection." Indeed, the district court's instructions were so unclear that the jury was left, in effect, to flounder on its own not only with respect to the facts it was to determine but also to the law it should apply. *Cf. Greminger v. Seaborne,* 584 F.2d 275, 278 (8th Cir.1978) (scope of constitutional right "matter for determination by the trial court not the jury"). In addition, the court erroneously refused to instruct the jury regarding plaintiff's due process claim. As further evidence of the confusion permeating the trial, I note that the court refused defendant's requested instruction on mitigation of damages, and allowed the jury to return inconsistent awards of both nominal and actual damages.

It is certainly not the trial court's responsibility to try plaintiff's case for him. Nevertheless, the court is obligated to instruct the jury clearly and comprehensively on all claims properly submitted. The most charitable solution to the problems presented by the record in this case is, in my opinion, to vacate the jury's verdict as well as the court's directed verdict on plaintiff's invasion of privacy claim and remand for new trial with leave to the district court to consider upon appropriate motion amendment of pleadings to reflect other state claims that might be available to plaintiff. In sum, I would reverse and remand.