William E. MARTIN,
Plaintiff-Appellant,

v.

Sgt. Earl KELLEY, Defendant-Appellee.

No. 84–3907.

United States Court of Appeals,
Sixth Circuit.

Submitted Aug. 4, 1986.

Decided Oct. 8, 1986.

William E. Martin Lucasville, Ohio, Pro Se.

Allen P. Adler, Asst. Atty. Gen., Columbus, Ohio, for defendant-appellee.

Before KEITH and MERRITT, Circuit Judges, and CONTIE, Senior Circuit Judge.

CONTIE, Senior Circuit Judge.

Plaintiff-Appellant William E. Martin appeals from a decision of the district court dismissing his pro se civil rights complaint. Appellant's complaint raises First Amendment free speech and Fourteenth Amendment due process challenges concerning the censorship of incoming prisoner mail. Appellant argues that the applicable mail censorship regulation for incoming mail,

Ohio Admin.Code § 5120–9–17, is unconstitutional on its face. For the reasons which follow, we agree with the appellant, reverse the order of the district court, and remand this case for further proceedings.

## I.

Appellant is a prisoner at the Southern Ohio Correctional Facility in Lucasville, Ohio (SOCF). He alleges that on October 23, 1981, the assistant mail supervisor, defendant Sgt. Kelley, "intercepted" a letter written to appellant on Ku Klux Klan letterhead signed by one John Kahne. Appellant states that he was denied an opportunity to read the letter, and was forced by Sgt. Kelley to return the letter to the sender. Defendant Kelley had concluded that the letterhead was "inflammatory," as was the text of the letter, and should therefore be withheld from the inmate and returned to the author. Kelley believed the text to be inflammatory because the letter mentioned the possibility of having a Ku Klux Klan meeting at the prison. Appellant asserts that his request to forward the letterhead to the Publication Screening Committee for review before it was returned to the sender was denied by Kelley. The letter was photocopied and placed in appellant's mail file. The appellant further alleges that he returned the letter to the wrong person, having not read the letter and believing another Ku Klux Klan member had authored the letter. Appellant asserts that it is the general practice at SOCF to seize letters without notifying the inmate or author, and without returning the letters to the author.

On December 30, 1981, appellant filed a pro se complaint in the United States District Court for the Southern District of Ohio, naming Sgt. Kelley as the sole defendant. He was granted leave to proceed in forma pauperis. The complaint alleged that the act of interference, and the refusal to submit the letterhead to the Publication Screening Committee, violated the mail censorship regulations and the First, Eighth and Fourteenth Amendments.[1] The complaint requested declaratory and injunctive relief as well as compensatory and punitive damages.

The defendant filed a motion to dismiss on January 18, 1982 which was then referred to a magistrate. The magistrate recommended, on April 19, 1982, that appellant's claims be dismissed for failure to state a claim under the doctrine of *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). On May 13, 1982, District Judge Spiegel rejected the magistrate's reliance on *Parratt*, concluding that appellant had adequately stated a claim under the First Amendment. However, the court held that appellant had failed to state a claim under the Eighth Amendment.

After a series of other motions were filed, appellant was permitted to file an amended complaint on March 29, 1983. The amended complaint and a motion to substitute parties named two other defendants: Ronald Marshall, the Superintendent of SOCF, and Richard Seiter, the Director of the Ohio Department of Rehabilitation and Correction. This complaint realleged appellant's claim that interference with his letter, and the refusal to submit the letterhead to the Publication Screening Committee, violated his First Amendment rights and the mail censorship regulations. The complaint also alleged that photocopying the letter, without cause, violated the First Amendment and section 5120–9–17 of the Ohio Admin.Code. He also alleged that he was denied due process when his letter was censored and photocopied, and that section 5120–9–17 was unconstitutional in that it did not provide adequate procedural safeguards for censoring mail. Appellant again requested declaratory and injunctive relief as well as compensatory and punitive damages.

On June 21, 1983, the defendants filed a motion for partial summary judgment as to the issues raised in appellant's first com-

---

1. The appellant's Eighth Amendment claim was premised on the assertion that he suffered "severe mental anguish" when defendant Kelley, a prison official, violated a rule without consequence.

plaint. On November 3, 1983, the magistrate recommended that summary judgment for defendant Kelley be granted, reasoning that a single act of censorship cannot constitute a First Amendment violation in the absence of proof of damages, principally relying on the case *Morgan v. Montanye,* 516 F.2d 1367 (2d Cir.1975), *cert. denied,* 424 U.S. 973, 96 S.Ct. 1476, 47 L.Ed.2d 743 (1976). The magistrate also ruled that the appellant lacked standing to challenge the prison's routine practice of seizing mail. On February 1, 1984, the district court adopted the magistrate's recommendations, and granted summary judgment on all issues for all of the defendants. However, the district court subsequently vacated this order on March 15, 1984 after recognizing that the new issues raised in the amended complaint had not been addressed by the magistrate. The case, in its entirety, was again referred to the magistrate.

In a final report issued September 13, 1984, the magistrate recommended that summary judgment be granted as to all the defendants on each of the claims. The magistrate adhered to his original reasoning regarding the issues raised in the initial complaint. He further reasoned that the single instance of photocopying mail, in violation of section 5120–9–17(G)(6),[2] did not amount to a constitutional violation. Further, the magistrate ruled that section 5120–9–17 was not procedurally inadequate under the standards set forth in *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), because the appellant had been notified of the rejection and another provision of the Ohio Admin.Code, section 5120–9–31, provided inmates with adequate process. Finding no constitutional violations, the magistrate did not recommend any form of relief.

The district court adopted the magistrate's recommendations, on October 16, 1984, stating that the appellant's claims should be dismissed pursuant to Fed.R. Civ.P. 12(b)(6). This appeal was filed on November 2, 1984.

On appeal, the appellant does not challenge the district court's disposition of his claims relating to the "interception" of the letter on Ku Klux Klan letterhead,[3] or the

---

**2.** Section 5120–9–17(G)(6) provides:

> Mail which is held as evidence may be photocopied for use by persons involved with any criminal prosecution or disciplinary proceeding.
>
> This section does not authorize photocopying simply because mail is returned, withheld or censored.

**3.** As previously noted, the district court adopted the magistrate's report holding that, in the absence of a showing of damages, an isolated instance of interference with mail does not state a constitutional claim. The magistrate relied on *Morgan v. Montanye,* 516 F.2d 1367 (2d Cir.1975), *cert. denied,* 424 U.S. 973, 96 S.Ct. 1476, 47 L.Ed.2d 743 (1976). The plaintiff in *Morgan* alleged that prison officials had interfered with one piece of mail from his attorney in violation of the prison mail regulations and the Constitution. The court analyzed the plaintiff's claims as a Sixth Amendment right to effective assistance of counsel claim, and a Fourteenth Amendment right of access to the courts claim. *See, e.g., Martinez,* 416 U.S. at 419, 94 S.Ct. at 1814 (right of access to the courts grounded in Due Process Clause). The Second Circuit did not cite to *Martinez,* nor did it treat the case as a First Amendment free speech case. In disposing of plaintiff's claims, the court focused on the fact that the plaintiff only alleged a single interference with his mail, as well as the fact that he had failed to show that he had been damaged in any way by this interference.

Although the issue of whether the appellant's rights were abridged by the withholding of this letter is not before this court, we note that after *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978), where the Court held that a plaintiff was entitled to at least nominal damages for violation of his constitutional rights, the question of whether there has been a constitutional violation should not be considered dependent on whether actual damages have occurred. *See Marohnic v. Walker,* 800 F.2d 613, (6th Cir.1986) (do not need to show actual injury to establish First Amendment violation); *Walje v. City of Winchester, Kentucky,* 773 F.2d 729, 732 (6th Cir.1985) (same). *Cf. Owen v. Lash,* 682 F.2d 648 (7th Cir.1982) (at least nominal damages awarded for interference with inmate's correspondence); *Wolfel v. Bates,* 707 F.2d 932, 934 (6th Cir.1983) (per curiam) (nominal damages awarded for violation of inmate's First Amendment right to "seek redress of grievances"); *McNamara v. Moody,* 606 F.2d 621, 625 (5th Cir. 1979) (nominal damages awarded for interfer-

photocopying of that letter; therefore, we will not review them. Rather, the appellant only argues on appeal that Ohio Admin.Code § 5120–9–17 is unconstitutional on its face under the standards set forth in *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).

## II.

The district court's October 16, 1984 order specifies that the appellant's complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted; the defendants had requested, and the magistrate had recommended, however, that summary judgment be granted pursuant to Rule 56(c), Fed.R.Civ.P.[4] Since the district court adopted the magistrate's report concluding that the recommendations were correct, the district court in effect held that Ohio Admin.Code § 5120–9–17 was not unconstitutional because another provision supplied

adequate procedural safeguards. This conclusion is the equivalent of a grant of summary judgment rather than a Rule 12(b)(6) dismissal in that it clearly reached the merits of appellant's claim and looked beyond appellant's complaint. Therefore, we will review the district court's order under summary judgment standards; and, since there are no issues of material fact in dispute regarding the contents of the regulation being challenged, we will reach the merits of appellant's claim.

## A.

This case, like the controlling prisoner mail censorship case *Procunier v. Martinez,* concerns the constitutionality of a regulation which was promulgated by the director of the State Department of Rehabilitation and Corrections. The regulation being challenged, Ohio Admin.Code § 5120–9–17, provides in relevant part:

ence with prisoner mail because there was no showing of actual damages), *cert. denied,* 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980). *See also Memphis Community School District v. Stachura,* — U.S. —, 106 S.Ct. 2537, 2543–44, 91 L.Ed.2d 249 (1986) (explaining *Carey v. Piphus* ). Since *Morgan* was not analyzed as a First Amendment case, we further note that there are a number of cases which have found that one instance of mail censorship can amount to a constitutional violation under the First Amendment. *See, e.g., Trudeau v. Wyrick,* 713 F.2d 1360 (8th Cir.1983) (interference with one letter was a constitutional violation under *Procunier v. Martinez* ); *McNamara,* 606 F.2d 621 (it is a violation of the First Amendment to suppress individual letters without showing that a substantial governmental interest would be met by suppressing such letters); *Nichols v. Knowles,* No. 80–496–Z (D.Mass. May 29, 1985) (absolute censorship of two letters was unconstitutional denial of First Amendment rights). *Cf. Abdul Wali v. Coughlin,* 754 F.2d 1015, 1028 (2d Cir.1985) (First Amendment violated by prison's refusal to permit inmates access to specific report); *Campbell v. Sumner,* 587 F.Supp. 376, 378 (D.Nev.1984) (the decision to withhold a specific letter "must be accompanied by procedural safeguards" to be constitutional). *But see Woods v. Yeager,* 463 F.2d 223, 224–25 (3d Cir.1972) (the single act of interference with prisoner's mail failed to state a claim for injunctive relief or damages). We do not express an opinion on

these issues, but simply question the applicability of *Morgan* to the fact pattern in this case.

4. The two rules have different standards and different results. A Rule 12(b)(6) dismissal should be granted only when the court, upon review of the complaint, is convinced that the complainant can prove "no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). *See also Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). A summary judgment motion may be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of satisfying Rule 56(c) standards, *Davis v. Robbs,* 794 F.2d 1129, 1130 (6th Cir.1986), and the evidence, and the reasonable inferences therefrom, must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 153–57, 90 S.Ct. 1598, 1606–08, 26 L.Ed.2d 142 (1970); *Smith v. Hudson,* 600 F.2d 60, 63 (6th Cir.), *cert. dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979). Granting summary judgment, therefore, is a decision on the merits of a party's claim or defense.

(A) There shall be no censorship, copying or reading of first class mail in the form of letters addressed to an inmate, except as provided in paragraph (G) of this rule, nor shall there be any limitation upon the number of first class letters that an inmate may receive nor the number of persons with whom an inmate may correspond.

.  .  .  .  .

(G) Mail to or from an inmate may be opened and read, provided that the managing officer or his designee has a reasonable belief that the written contents of mail other than legal mail, present a clear and present danger to institutional security, and such action has been approved by the director or his designee, pursuant to a request by the managing officer.

.  .  .  .  .

(4) Approval of the director or his designee to open and read and copy such mail shall extend only to the managing officer or his designees.

(5) If, after reading such mail, the managing officer or his designee determines that it does not constitute a clear and present danger to institutional security, it shall be promptly forwarded to the inmate addressee. Otherwise, the mail shall be returned to the sender or held as evidence for a criminal prosecution or disciplinary proceeding.

.  .  .  .  .

Therefore, once it has been decided that a prisoner's mail may be opened and read,[5] the managing officer or his designee has the authority to decide if an item of mail constitutes a "clear and present danger to institutional security;" if the letter does constitute such a danger, it is to be returned to the sender or held for evidence in future proceedings. Section 5120–9–17 does not define "clear and present danger," nor does it require that notice be given to the inmate-addressee or the author-sender when a letter is to be rejected, censored or withheld. It also does not provide for a procedure whereby the managing officer's decision may be appealed to and reviewed by a third party prior to the letter being returned to the sender.

**B.**

The First Amendment freedoms, including the freedom of speech,[6] have always occupied a preferred status in constitutional jurisprudence for it is these freedoms which ensure a free and democratic society. After the Supreme Court decision in *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), there was no doubt that "first amendment concerns are implicated when restrictions are imposed upon an inmate's correspondence." *United States v. Holloway*, 740 F.2d 1373, 1382 (6th Cir.), *cert. denied*, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 366 (1984). The Court in *Martinez* reasoned that it was unnecessary to determine to what extent prisoners retained First Amendment freedoms, however, since free citizens have a protected First Amendment right to communicate with prisoners through uncensored correspondence, whether as an author or as an intended mail recipient. *Martinez*, 416 U.S. at 408–09, 94 S.Ct. at 1808–09.[7]

**5.** The appellant acknowledges that his mail was properly subject to this review procedure.

**6.** The freedom of speech is secured against abridgement by the states through the Fourteenth Amendment. *Edwards v. South Carolina*, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963); *Schneider v. State*, 308 U.S. 147, 160, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

**7.** In *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974), the Court stated that a prisoner did retain First Amendment freedoms which were "not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections systems." *See also Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 129, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977). Despite the language in the Supreme Court case *Wolff v. McDonnell*, 418 U.S. 539, 575–76, 94 S.Ct. 2963, 2984, 41 L.Ed.2d 935 (1974), stating that the Supreme Court had yet to explicitly decide to what extent prisoners retained First Amendment free speech rights, several cir-

The Court reasoned that in order for a mail censorship regulation to pass constitutional muster, it must satisfy both parts of a two-pronged test:

First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression.... [Prison officials] must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad.

*Id.* at 413–14, 94 S.Ct. at 1811.[8] Under this test, the Court struck down a mail censorship regulation which disallowed correspondence that "magnif[ied] grievances," "express[ed] inflammatory political, racial, religious or other views or beliefs," pertained to criminal activity, was "lewd, obscene, or defamatory; contain[ed] foreign matter, or [was] otherwise inappropriate." 416 U.S. at 399–400, 94 S.Ct. at 1804–05. The Court held that no substantial justification was offered for this regulation unrelated to suppressing free speech and that the regulation swept too broadly, providing officials with too much discretion to suppress protected speech. *Id.* at 415–16, 94 S.Ct. at 1812.

The Court also concluded that mail censorship regulations could suffer from another deficiency. Concluding that an individual's interest in uncensored mail is a liberty interest which must be "protected from arbitrary governmental invasion," *id.* at 418, 94 S.Ct. at 1814, the Court further held that due process requires a "decision to censor or withhold delivery of a particular letter ... be accompanied by *minimal procedural safeguards*" to be constitutional. *Id.* at 417, 94 S.Ct. at 1814 (emphasis supplied). The Court thereafter approved the district court's order requiring that: (1) notice be given to the inmate of the rejected letter; (2) a reasonable opportunity be given to the author of the letter to protest the rejection decisions; and (3) complaints concerning the rejection be reviewed by someone other than the individu-

---

cuits, relying on *Pell*, have reasoned that prisoners do have First Amendment free speech rights "not inconsistent with" their prisoner status. *See, e.g., Finney v. Arkansas Board of Corrections,* 505 F.2d 194, 211 (8th Cir.1974); *Guajardo v. Estelle,* 580 F.2d 748, 760 (5th Cir. 1978); *Pittman v. Hutto,* 594 F.2d 407, 410 (4th Cir.1979); *Aikens v. Jenkins,* 534 F.2d 751, 755 (7th Cir.1976). *Cf. Safley v. Turner,* 777 F.2d 1307, 1311–13 (8th Cir.1985) (abolishing rule restricting correspondence between inmates), *cert. granted,* — U.S. —, 106 S.Ct. 2244, 90 L.Ed.2d 691 (1986). *See also Martinez,* 416 U.S. at 422–28, 94 S.Ct. at 1815–18 (Marshall, J., concurring), 428–29, 94 S.Ct. at 1818–19 (Douglas, J., concurring). Since the challenged regulation in the instant case deals with censoring incoming mail, we need not decide whether, or to what extent, prisoners retain the right of free speech since our analysis is controlled by *Martinez* and the First Amendment rights of free, non-incarcerated citizens.

**8.** This test does not differ significantly from the test previously enunciated by the Court in a different context:

[A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968) (upholding statute which made it a criminal offense to burn Selective Service registration certificates). The Court in *Martinez* noted that *O'Brien,* as well as *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) and *Healy v. James,* 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), although not controlling, was analogous in that it involved "incidental restrictions on First Amendment liberties by governmental action in furtherance of legitimate and substantial state interest other than suppression of expression." *Martinez,* 416 U.S. at 411–12, 94 S.Ct. at 1810.

al who originally rejected the letter. *Id.* at 418–19, 94 S.Ct. at 1814.

There are two potential problems with the regulation challenged in the instant case. The first is a concern that the regulation's sweep is too broad, and the second relates to the adequacy of procedural safeguards.

### 1.

■ Section 5120–9–17 provides that mail must be withheld from the inmate and returned to the sender if the managing officer determines that it constitutes "a clear and present danger to institutional security." Section 5120–9–17, however, does not define this phrase, nor does it otherwise provide specific guidelines for when mail can be censored. Without guidance, prison officials would be provided with complete discretion to censor mail. If a prisoner mail censorship regulation is not narrowly tailored to meet the articulated governmental interest involved, then it violates the First Amendment. *Martinez,* 416 U.S. at 415–16, 94 S.Ct. at 1812. *Cf. Plain Dealer Publishing Co. v. City of Lakewood,* 794 F.2d 1139, 1143–46 (6th Cir.1986) (vesting unbridled discretion in municipal official for granting newsrack license is not narrowly tailored and is therefore unconstitutional under First Amendment).

■ However, we do not believe that section 5120–9–17 should be held invalid on the theory that it is overbroad and allows for the censorship of protected speech. If it is possible to interpret a regulation so as to protect it from an overbreadth attack, such an interpretation should be adopted. *See Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973) ("Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute."). In this instance, Ohio Admin. Code § 5120–9–19, a regulation governing the censorship of printed material,[9] provides a definition of "clear and present danger to the security or safety of the institution." Pursuant to section 5120–9–19, printed material does not constitute a clear and present danger to institutional safety "solely on the basis of its appeal to a particular ethnic, racial or religious audience." Ohio Admin.Code § 5120–9–19(D)(2). Rather,

[i]n order to constitute a clear and present danger to the security or safety of the institution, the printed material must meet at least one of the following criteria:

(a) Printed material which incites, aids, or abets criminal activity, such as rioting or illegal drug use.

(b) Printed material which incites, aids, or abets physical violence against others, including instruction in making, using, or converting weapons.

(c) Printed material which incites, aids, or abets escape, such as instruction in picking locks or digging tunnels.

*Id.*

We find, as a matter of statutory interpretation, that section 5120–9–19(D)(2) also defines the phrase "clear and present danger to institutional security" in section 5120–9–17. This is a logical conclusion because words or phrases should be given consistent meaning when used in related regulations unless the regulation specifically provides otherwise. Further, by adopting this interpretation and allowing personal letters to be censored only when one of the listed criteria is met, the requirements in *Martinez* will be satisfied. First, the regulation furthers the important governmental objectives of prison security and order and is unrelated to the suppression of speech; second, the regulation is narrowly tailored to meet that governmental objective. *See, e.g., Martinez,* 416 U.S. at 413, 414 n. 14, 94 S.Ct. at 1811, 1812 n. 14

---

9. "Printed material" is defined as "newspapers; magazines; pamphlets; books; photographs ...; drawings; and prerecorded magnetic · tapes." Ohio Admin.Code § 5120–9–19(B)(1). Printed material specifically "does not include personal letters." *Id.* This regulation's origins can be traced to a court order. *See Taylor v. Perini,* 455 F.Supp. 1241, 1244–45 (N.D. Ohio 1978).

(discussing examples of justifiable censorship and quoting from Policy Statement 7300.1A of the Federal Bureau of Prisons); *Gaines v. Lane*, 790 F.2d 1299, 1304–05 (7th Cir.1986) (upholding regulations which were "well-tailored to minimize their intrusiveness" and which provided prison officials with adequate guidance); *Meadows v. Hopkins*, 713 F.2d 206, 211 (6th Cir.1983) (upholding regulations under *Martinez*). *See also Hopkins v. Collins*, 411 F.Supp. 831 (D.Md.1975) (regulations which lacked specificity and were not narrowly tailored found unconstitutional), *aff'd in part and rev'd in part on other grounds*, 548 F.2d 503 (4th Cir.1977); *Taylor v. Perini*, 455 F.Supp. 1241, 1244–45 (N.D.Ohio 1978) (court order for adopting the specific criteria involved here). With such guidelines, prison officials are not given unfettered discretion to censor personal mail, *see Meadows*, 713 F.2d at 211, and the inherent problems of censoring and chilling protected speech are minimized.

### 2.

The second possible defect of section 5120–9–17 is a due process defect. As previously noted, the Court in *Martinez* upheld the district court's order which required that three procedural safeguards be followed. Specifically, these requirements were that "an inmate be notified of the rejection of a letter written by or addressed to him, that the author of that letter be given a reasonable opportunity to protest that decision, and that complaints be referred to a prison official other than the person who originally disapproved the correspondence." *Martinez*, 416 U.S. at 418–19, 94 S.Ct. at 1814. None of these safeguards are included in section 5120–9–17.[10]

The *Martinez* Court did not express an opinion, however, as to whether any, or all, of these procedures were required for a regulation to be constitutional. For the reasons below, we believe each of these procedural safeguards are required under *Martinez*.

As an initial matter, we note that the "minimum procedural safeguards" referred to in *Martinez* are not mandated solely because of the Due Process Clause of the Fourteenth Amendment, but are primarily required because of the First Amendment free speech rights that are being protected. It is because of the concerns over protecting the freedom of speech and preventing the chilling of speech that procedural safeguards must be in place before letters are withheld or censored. *See Martinez*, 416 U.S. at 406 n. 10, 418–19, 94 S.Ct. at 1808 n. 10, 1814. *Campbell v. Sumner*, 587 F.Supp. 376, 378 (D.Nev.1984). Therefore, we must determine which procedures are required under the Due Process Clause to adequately protect the important First Amendment interests at stake.

We first hold that an incoming mail censorship regulation must provide that notice of rejection be given to the inmate-recipient. The need for such a requirement is evident: without notice of rejection, censorship of protected speech can escape detection by inmates and therefore go unchallenged. Although prison officials may have occasionally, or even consistently, given notice to inmates, the regulation does not require that notice be given.

Second, we hold that the mail censorship regulation is insufficient because it fails to require that notice and an opportunity to protest the decision be given to the

---

**10.** We note that § 5120–9–19 provides that notice be given to an inmate when printed material is to be censored, and also provides for detailed appeal and review process culminating in review by a Publication Screening Committee. Ohio Admin.Code § 5120–9–19(E) and (F). Although we have borrowed a definition from § 5120–9–19 to uphold § 5120–9–17 on overbreadth grounds, we believe there is no support for borrowing the procedural safeguards. First, this regulation specifically distinguishes between personal letters and printed materials and provides that personal letters are not "within the scope of this provision...." *Id.* at § 5120–9–19(B)(1). Second, the screening committee is specifically labeled a "publication" screening committee; this is another indication of the distinction which was drawn between personal letters and printed material. Therefore, the constitutionality of § 5120–9–17 must be judged apart from these unrelated procedural provisions.

author of the rejected letter. We reach this conclusion for two reasons. First, the decision in *Martinez,* as previously discussed, was premised on the fact that the First Amendment rights of free citizens were implicated by the censorship of prisoners' mail. Without notifying the free citizen of the impending rejection, he would not be able to challenge the decision which may infringe his right to free speech. *Cf. Trudeau v. Wyrick,* 713 F.2d 1360, 1366 (8th Cir.1983) (author of letter brought a First Amendment challenge);[11] *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1027–28 (2d Cir.1985) (the author would have standing to challenge interference with prisoners' mail). Second, since the inmate-recipient would not have seen the contents of the withheld letter, he may require the aid of the author to meaningfully challenge the rejection decision. *See Cofone v. Manson,* 409 F.Supp. 1033, 1042 (D.Conn.1976) (holding that a publisher must receive notice when a prison official decides to withhold a particular publication since a prisoner "cannot be expected to marshal arguments in favor of its admission without the assistance of someone familiar with the material").

■ We conclude, finally, that a mail censorship regulation must provide for an appeal of the rejection decision to an impartial third party prior to the letter being returned. This is necessary to ensure that future rejection decisions are fair, and based on appropriate factors.

■ In the instant case, the district court approved the magistrate's report which reasoned that the grievance procedure of Ohio Admin.Code § 5120–9–31 satisfied the procedural requirements in *Martinez.* Although we agree with the district court's initial premise that *Martinez* did not mandate that one regulation provide all the

requisite safeguards, we nonetheless reject its ultimate conclusion.

Section 5120–9–31 is a general grievance procedure, unrelated to the mail censorship regulations. The purpose of the grievance procedure is to provide inmates with a method of presenting complaints which "relate to any aspect of institutional life. It may concern departmental or local institutional policies, procedures, rules and regulations, or the application of any of these to the grievant." As an initial observation, it is clear that if an inmate is never notified that a letter has been rejected, he would not be able to challenge the decision through a grievance procedure. Since section 5120–9–31 does not address the need for notifying the inmate of rejection, it is deficient under *Martinez.* As noted above, the fact that notification of rejection was given on this particular occasion simply does not address the question of whether the regulation is unconstitutional on its face. Also, the grievance procedures are designed for inmate complaints; an author of a letter who wishes to challenge a rejection decision would not be able to utilize this mechanism. Therefore, section 5120–9–31 fails to provide for the second *Martinez* procedural safeguard. Finally, were this the only procedural safeguard required, mail censorship would occur and the letter would be returned to the sender before the grievance would be resolved, or even filed. Under section 5120–9–17, there is no requirement that the letter be saved pending grievance procedures; rather, the managing officer can make a unilateral decision to return a letter to the sender, apparently on-the-spot. As a result, the grievance procedure is inadequate under *Martinez* in that procedural safeguards should be designed to prevent unjustified censorship, not merely to provide a remedy for an aggrieved inmate. It must also be remembered that the prison officials carry

**11.** In *Trudeau,* the author of the letter filed suit in federal court challenging the prison's interference with one letter. The Eighth Circuit held that the author had a constitutionally protected right "to have [a] letter delivered to the inmate free of unjustified interference by state officials," 713 F.2d at 1364,

and that *Martinez* required that "some form of notice [be given] to the author and to the intended recipient that delivery of the letter was being upheld...." *Id.* at 1366. The plaintiff won the case and was awarded substantial damages.

the burden of justifying a mail censorship decision; it is our belief that a post-rejection grievance procedure would not adequately address the threat of the arbitrary suppression of speech and would place a burden on the inmate, or free citizen, which is not theirs to carry.

For the above stated reasons, we find that section 5120–9–17 is unconstitutional, and this case is REMANDED to the district court for further proceedings consistent with this opinion.

MERRITT, Circuit Judge, concurring in part and dissenting in part.

I agree with our Court and the court below that prison officials do not abridge an inmate's substantive first amendment rights when they refuse to permit the letter in question here to circulate in the prison. The letter, written on stationery headed, "UNITED STATES OF AMERICA, INVISIBLE EMPIRE, KNIGHTS OF THE KU KLUX KLAN, INTERNATIONAL OFFICES," says:

Dear William:

I received your letter today. The one letter i got told me to see the chapl in was in Dayton. Nother one said he was in Columbus. I got one of my officers checking it out now. I have got some good news for you. Get about three people to fill out the application for the Klansman newspaper and send it down to the nat. office along with a check or money order, If they refuse you to have the paper you will have the national office backing you up. We will stand behind you too! I want to come and see you and any one else that is interested in the Klan. Can you set up a meeting for us?

I dont want to come under f alse name. Please let me know what you can do.

Very Truly Yours
For God, Race, Nation
JOHN K. ————
KLEAGLES REALM OF OHIO

A sizeable percentage of the prison population is black, and the circulation of this letter and the Ku Klux literature described in it, as well as the possibility of the Ku Klux Klan organizational meeting mentioned in the letter, may well lead to fights in the prison. The eighth amendment permits punishment that severely limits the personal liberties of convicted felons, including limits on the right to disseminate Ku Klux Klan literature in a prison that may well lead to strife and violent conduct. The prison officials here believed, and I agree, that introducing Ku Klux Klan materials into the prison population would likely lead to violent conduct. On these facts, the prison officials properly rejected the letter.

I part company with the Court on the due process issue. Due process requires that the prisoner be notified of the rejected letter. *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1973). He was notified here. Due process does not require that the constitutional notice requirement be reduced to an administrative regulation so long as adequate notice in fact occurs. Notice is notice, and it need not be packaged in some particular way that appeals to the appellate judge's penchant for order and neatness. Of course, if an institution does not give some type of notice in every case, such a set of inconsistent practices under the due process clause must be changed.

*Martinez* does not suggest that procedures required by due process be separately written out in a regulation. Our court and the parties cite no authority and refer to no legal tradition that requires that the constitutional notice requirement be put in an administrative regulation, and I know of no such authority or tradition.

In addition, due process as articulated in *Martinez* is satisfied so long as some reasonable system exists (1) for sending the rejected letter back to the writer so that the writer receives notice of the rejection and (2) for allowing the writer to initiate a procedure to protest the rejection. Although the due process issue concerning the author of the letter was raised in the complaint below and on appeal, the District

Court did not address this question. We do not know what procedures exist in the prison to provide notice of rejection to the author of a personal letter or to permit the author to protest. The case should therefore be remanded to the District Court for findings of fact and conclusions of law under Rule 52, Fed.R.Civ.P. on this issue.