**In re William L. DERIENZO and Elaine J. Derienzo, Debtors.**

**William G. Schwab, Trustee for William L. Derienzo and Elaine J. Derienzo, Plaintiff,**

v.

**Sears, Roebuck and Co. and Sears National Bank, Defendants.**

**Bankruptcy No. 5–96–01186.**
**Adversary No. 5–96–00248A.**

United States Bankruptcy Court,
M.D. Pennsylvania.

Oct. 18, 2000.

Joseph G. Murray, Wilkes–Barre, PA, for Plaintiff.

William G. Schwab, Trustee in Bankruptcy, Lehighton, PA, William Gibbons, Patrick E. Gibbs, Latham & Watkins, Chicago, IL, for Defendants.

Charles J. Phillips, Baskin, Leisawitz, Heller & Abramowitch, P.C., Berkshire Commons, Wyomissing, PA, Co–Counsel for Defendants.

## *OPINION* [1]

JOHN J. THOMAS, Bankruptcy Judge.

*Procedural History*

The Defendants' Motion for Summary Judgment and Plaintiff's (Trustee's) Cross–Motion for Summary Judgment for the Four Lead Cases and Partial Summary Judgment for All Other Cases stems from a complex bankruptcy pro-

---

**1.** Drafted with the assistance of Mark R. Owens, former Law Clerk.

**2.** The full title of the Stipulation is "Plaintiff, William G. Schwab, Trustee, and Defendants,

ceeding entailing more than two hundred (200) separate adversary actions brought by Attorney William G. Schwab (Trustee), as chapter seven Trustee for numerous debtors, against Sears, Roebuck and Company (SRC, and, sometimes referred to by Defendants as "Sears") and Sears National Bank (SNB), identified jointly as the Defendants. The parties have stipulated to consolidate these cases into the case of *In re William L. and Elaine J. Derienzo*, Bankruptcy No. 5–96–01186, Adversary No. 5–96–00248A, as the lead adversary proceeding. (Stipulation filed May 12, 1998 [2] (Doc. # 79A).) The Trustee's Complaint consists of four Counts: (1) "Complaint to Determine Lien Status Under 11 U.S.C. § 506," (2) "Complaint for Violation under the Truth in Lending Act (15 U.S.C. § 1637 et seq.) Seeking Damages and Lien Avoidance," (3) "Complaint for Violation under the Pennsylvania Unfair Trade Practices and Consumer Protection Law" (73 P.S. § 201 et seq.), and (4) "Complaint under Plain Language Consumer Contract Act of the Commonwealth of Pennsylvania (73 P.S. § 2201 et seq.)," in relation to the credit accounts between Defendants and the Debtors. The Trustee succeeds to the Debtors' causes of actions under these statutes. See, for example, *Leffew v. Kugler [and First Southern Cash Advance]*, 220 B.R. 598 (E.D.Tenn.1998); *Ball v. Nationscredit Financial Services Corp.*, 207 B.R. 869, 872 (N.D.Ill.1997). The Trustee's action finds its origin in an attempt by SRC to assign existing lines of consumer credit to its subsidiary, SNB, presumably for the purpose of increasing the chargeable interest rate.

The parties have also stipulated that all of the adversary proceedings can be grouped into four categories:

Sears, Roebuck and Co. and Sears National Bank's Stipulation to Consolidate Adversary Proceedings Pursuant to Bankruptcy Rule 7042."

A. **Category I**—These actions involve Debtors' accounts which did not incur any charges after the May 1, 1995 transfer, whose finance charge designation on the monthly billing statement is "ALL," and which were delinquent at some time prior to the Debtors' bankruptcy petition date.

B. **Category II**—These actions involve Debtors' accounts which did not incur any charges after the May 1, 1995 transfer, whose finance charge designation on the monthly billing statement is "ALL," and which remained current up to the time of the Debtors' bankruptcy petition date.

C. **Category III**—These actions involve Debtors' accounts which incurred charges both before and after the May 1, 1995 transfer, whose finance charge designation on the monthly billing statement is "ALLOCATED" between SEARS, ROEBUCK AND CO. and SEARS NATIONAL BANK, and which remained current up to the Debtors' bankruptcy petition date.

D. **Category IV**—These actions involve Debtors' accounts which incurred charges both before and after the May 1, 1995 transfer, whose finance charge designation on the monthly billing statement is "ALLOCATED" between SEARS, ROEBUCK AND CO. and SEARS NATIONAL BANK, and which were delinquent at some time up to the Debtors' bankruptcy petition date.

Stipulation at 2.

### *Core versus Non-core Jurisdiction*

The Trustee has argued that the proceedings before me are core matters to which this Court has the jurisdiction to enter final decisions. I would have such jurisdiction if the matters before me were either core or, should the parties consent to the issuance of a final order, non-core. While not specifically defined, 28 U.S.C. § 157(b)(2) sets forth examples of core matters, which include a "determination of the validity, extent, or priority of liens." Moreover, "a proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *Beard v. Braunstein,* 914 F.2d 434, 444 (3rd Cir. 1990) (quoting *Wood v. Wood (Matter of Wood),* 825 F.2d 90, 97 (5th Cir.1987)). While there appears to be no dispute that Count One of the Trustee's Complaint, asking for a determination of the lien status of the obligation owing SRC and SNB by the Debtors is core, the Court has significant doubt that the same can be said as to the remaining Counts of the Trustee's Complaint. These remaining Counts arise from an effort to enforce a Congressional attempt, through the Truth in Lending Act, to regulate disclosure among creditors, and Pennsylvania's efforts to prohibit unfair trade practices (Pennsylvania Unfair Trade Practices and Consumer Protection Law) as well as insure that contracts are articulated in plain language (Plain Language Consumer Contract Act). While these matters may enrich the bankruptcy estate and, thus, be related matters, they neither arise in nor arise out of the bankruptcy. I, therefore, find that they are non-core in nature allowing me to make only recommended findings of fact and conclusions of law absent the consent of the parties.

Notwithstanding this conclusion, the Trustee argues that the parties, by their actions, have consented to my issuing a final judgment. "[T]he exercise of article III power by a bankruptcy judge requires the consent of all parties to the proceeding. Generally, just as in the case of consenting to determination by a magistrate, this consent should be explicit and on the record." *In re Nell,* 71 B.R. 305, 311 (D.Utah 1987). Even if the Defendants did not expressly consent to my

issuing a final order, they may, by implication, give such consent. *In re G.S.F. Corp.*, 938 F.2d 1467, 1476 (1st Cir.1991)(citing 28 U.S.C. § 157(c)(2)). "Implied consent is sufficient to grant the bankruptcy court authority to enter a final judgment." *Abramowitz v. Palmer*, 999 F.2d 1274, 1280 (8th Cir.1993); *In re Daniels–Head & Associates*, 819 F.2d 914, 918–19 (9th Cir.1987). However, "a court should not lightly infer from a litigant's conduct consent to have private state-created rights adjudicated by a non-Article III bankruptcy judge. Indeed, to do so would violate the spirit of *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 [102 S.Ct. 2858, 73 L.Ed.2d 598] (1982)." *In re Pioneer Inv. Services Co.*, 946 F.2d 445, 449 (6th Cir. 1991).

■ SRC and SNB specifically denied the Trustee's allegations of core jurisdiction. (See Trustee's Complaint at ¶ 5 and Defendants' Amended Answer at ¶ 5.) Nevertheless, in the Stipulation between the parties they agreed "[t]hat the Court's decision in the Lead Adversary Proceeding shall be dispositive and entered as a judgment on the issue of liability in the Truth in Lending Adversary Proceedings." [3] (Stipulation at 3. (Doc. # 79A).) This agreement between the parties is unequivocal and provides ample evidence that the non-core matters raised by Counts Two, Three, and Four may be adjudicated as a final judgment by this Court.

### Summary Judgment

The Defendants have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure and the Trustee has cross-motioned for summary judgment. Rule 56(c), made applicable to this proceeding through Bankruptcy Rule 7056, indicates that summary judgment may be entered only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party moving for summary judgment has the burden of proving that there is no genuine issue of material fact. *Id.* Additionally, "[i]f ... there is any evidence in the record from any source from which a reasonable inference in the respondent's favor may be drawn, the moving party simply cannot obtain a summary judgment." *In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238, 258 (1983), *rev'd on other grounds sun nom. Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). With regard to "materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Furthermore, there must be a "genuine" issue of the material fact, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" an issue would be genuine. *Id.* at 248–50, 106 S.Ct. 2505. The Court in *Anderson* also explained that "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249, 106 S.Ct. 2505 (citations omitted).

### Lien Status-(Count One)

■ In support of his Cross–Motion for Summary Judgment, the Trustee makes a

---

**3.** Even though the Trustee included Counts for violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law and the Plain Language Consumer Contract Act, the parties collectively referred to all related litigations as the "Truth in Lending Adversary Proceedings."

series of conclusory statements having little substance. In essence, the Trustee argues that "[t]here is nothing in the record to suggest that SNB ever gave value for the alleged transfer of accounts from Sears, Roebuck and Co. to SNB." (Redacted Memorandum in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiff's Cross–Motion for Summary Judgment in the Four Lead Cases and Partial Summary Judgment in all Other Cases at 37 (Doc.# 102A).) While this may be true and may be of value in the Trustee's case, the Court has not been alerted as to how this may work in support of the Trustee's Cross–Motion.

When employing Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to this proceeding through Bankruptcy Rule 7056, "the moving party has the burden of demonstrating the absence of any material factual issue genuinely in dispute." *In re Euro–Swiss Int'l Corp.*, 33 B.R. 872, 11 B.C.D. 113 (Bankr.S.D.N.Y. 1983). The Third Circuit has made it clear "that courts are to resolve any doubts as to the existence of genuine issues of fact against the moving parties." *Hollinger v. Wagner Mining Equipment Co.*, 667 F.2d 402, 405 (3rd Cir.1981); *Ness v. Marshall*, 660 F.2d 517, 519 (3rd Cir.1981). As suggested previously, "[i]nferences to be drawn from the underlying facts contained in the evidential sources submitted to the trial court must be viewed in the light most favorable to the party opposing the motion." *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3rd Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

In this regard, I find that the better course is to deny the Trustee's Cross–Motion and set the matter for trial on this Count. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*Truth in Lending-(Count Two)*

■ The Trustee alleges that SRC and SNB have violated several provisions of the Truth in Lending Act (TILA).[4]

The purpose of TILA is expressed in Section 102, 15 U.S.C. § 1601:

The Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this title to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.

15 U.S.C. § 1601

■ The TILA must be liberally construed to effectuate these remedial purposes. *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973); see, *Thomka v. A.Z. Chevrolet, Inc.*, 619 F.2d 246 (3rd Cir.1980); *Zeltzer v. Carte Blanche Corp.*, 514 F.2d 1156 (3rd Cir.1975).

As earlier indicated, these issues arise from an attempt by SRC to transfer an existing line of credit to SNB, a subsidiary of a subsidiary, for business advantage not necessarily relevant to these immediate issues.

SNB was initially confronted with the prohibition found in 15 U.S.C. § 1642 that disallows issuance of credit cards without a request or application. An exception in that provision allows a credit card to be issued "in substitution for . . . an accepted credit card." Section 12(a)(2) of Regula-

---

**4.** TILA is located at § 15 U.S.C. 1601, et. seq.; Regulation Z is located at 12 C.F.R. § 226.1, et. seq.; and the Official Staff Commentary of the Federal Reserve Board to Regulation Z is located at 12 C.F.R. § 226.1, Supp. I.

tion Z reiterates this prohibition. 12 C.F.R. § 226.12(a)(2) (1998). In further explanation of this provision, the Comments to that section indicate,

> Substitution—successor card issuer. "Substitution" also occurs when a successor card issuer replaces the original card issuer (for example, when a new card issuer purchases the accounts of the original issuer and issues its own card to replace the original one). A permissible substitution exists even if the original issuer retains the existing receivables and the new card issuer acquires the right only to future receivables, provided use of the original card is cut off when use of the new card becomes possible.

Official Staff Interpretation to 12 C.F.R. § 226.12(a)(2), comment 3 (1998).

Here, the original issuer, SRC, retained the existing receivables, and SNB was assigned the right to future receivables. Under those circumstances, issuance of an unsolicited credit card from SNB was permissible.

Further charges on the SRC line were barred by SRC's transfer of the credit line to SNB. (Exhibit No. 5.) Nevertheless, its character as an open-end credit facility remained. The Comments to Regulation Z provides that, after termination, the account continues to be treated as an open-end account until the balance is paid. Official Staff Interpretation to 12 C.F.R. § 226.5(b)(2)(i), comment 2 (1998).

The Complaint of the Trustee alleges numerous violations of TILA. Schwab complains, more specifically, that SRC and SNC did not make the required disclosures under § 1637(b), to wit,

> (b) Statement required with each billing cycle
>
> The creditor of any account under an open end consumer credit plan shall transmit to the obligor, for each billing cycle at the end of which there is an outstanding balance in that account or with respect to which a finance charge is imposed, a statement setting forth each of the following items to the extent applicable:
>
> (1) The outstanding balance in the account at the beginning of the statement period....
>
> (3) The total amount credited to the account during the period....
>
> (8) The outstanding balance in the account at the end of the period....
>
> (10) The address to be used by the creditor for the purpose of receiving billing inquiries from the obligor.

15 U.S.C. § 1637(b)(1), (3), (8) and (10)

In large part, a determination of whether those violations occurred depends on a finding as to the existence of one or two accounts with SRC and SNB. If there is one account, then SRC, as the servicer for the charge card relationship with the Debtors, likely complied with basic requirements of TILA. If there are two accounts, then it is probable that the TILA requirements were violated. This is a logical conclusion based on the instructional authority of *Zeltzer v. Carte Blanche Corporation,* 514 F.2d 1156 (3rd Cir.1975).

In *Zeltzer,* Carte Blanche provided an airline account, traditionally identified as an "open-end credit plan," and a general account, wherein full payment was anticipated on a monthly basis. No indication was given by Carte Blanche as to the allocation of payments between the accounts. The Third Circuit found that Regulation Z did not exempt Carte Blanche from disclosing its division of payments between the accounts and the card company's practices were in direct violation of the Truth in Lending Act requirement that the method of determining the balance be disclosed. *Id.* at 1163. Much as here, the creditor argued that the interpretive ruling to Regulation Z excused the allocation of payments among multiple accounts. The *Zeltzer* Court, dismissed that defense by following the declared intent of Congress in assuring meaningful disclosure. The Court relied on the specific language

of 15 U.S.C. § 1637(b)(8) in concluding that the periodic statement must disclose "the balance on which the finance charge was computed and a statement of how the balance was determined." *Id.* at 1163.

SRC and SNB excuse their failure to disclose separate balances for each of their obligations by arguing that they are actually treated as a "multifeatured plan" for purposes of TILA's disclosure requirements. They cite to the comments to Regulation Z, which indicate, "[i]n a multifeatured plan, the previous balance may be disclosed either as an aggregate balance for the account or as separate balances for each feature." Official Staff Interpretation to 12 C.F.R. § 226.7(a), comment 2 (1998).

SNB and SRC argue that each balance, the SRC balance and the SNB balance, were different features of the same account and, therefore, separate compliance with TILA requirements for each balance was unnecessary. In their Brief in support of their Motion for Summary Judgment, SRC and SNB offer the following as evidence that only a single credit card account was at issue.

> Prior to May 1, 1995, the Debtor maintained a credit card account with Sears. In or around March of 1995, the Debtor received a Notice of Change In Credit Terms ("Notice"). Among other things, the Notice stated that after the May 1, 1995 billing date, the Debtor's " 'account' would be transferred" to SNB, and that the annual percentage rate of finance charges would be increased from 18% to 21%. Charges incurred before the May 1, 1995 Transfer would remain with Sears and would not be subject to the increased annual percentage rate.

Memorandum in Support of Defendants' Motion for Summary Judgment at 12 (Doc. # 71).

In order to interpret the term "single account" it is helpful to look to its use in other parts of the statute. *Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 567, 115 S.Ct. 1061, 1066, 131 L.Ed.2d 1 (1995)

("[A] term should be construed, if possible, to give it a consistent meaning throughout the Act"); *Sullivan v. Stroop,* 496 U.S. 478, 485, 110 S.Ct. 2499, 2504, 110 L.Ed.2d 438 (1990); *Martin v. Kelley,* 803 F.2d 236, 242 (6th Cir.1986) ("[W]ords or phrases should be given consistent meaning when used in related regulations unless the regulation specifically provides otherwise").

▮▮▮ Whether a relationship creates a single multi-featured account or more than a single account most often arises in TILA under 15 U.S.C. § 1640(g) which limits a recovery for multiple failures to disclose, to a single recovery for each account. In that vein, an indicator of separate accounts is different obligees. *Ljepava v. M.L.S.C. Properties, Inc.,* 511 F.2d 935, 945 (9th Cir.1975). Separate and distinct extensions of credit are evidence of multiple accounts. *Gill v. Mid–Penn Consumer Discount Co.,* 671 F.Supp. 1021 (E.D.Pa.1987), *aff'd without op.,* 853 F.2d 917 (3rd Cir.1988). Refinancings are certainly different transactions demonstrating the existence of separate accounts. *In re Scaife,* 825 F.2d 357 (11th Cir.1987); *Brown v. Marquette Sav. & Loan Ass'n.,* 686 F.2d 608 (7th Cir.1982).

What appears to be the obvious flaw in the reasoning of SRC and SNB is the failure of the Defendants to attach to a specific account, those "charges incurred before the May 1, 1995 Transfer" that remain with SRC. SRC has conveniently circumvented the requirements of TILA regarding the SRC obligation by ignoring that it has account status.

Furthermore, SRC and SNB ignore Comment 4 to § 221.7(e) of Regulation Z which clearly mandates that separate balances are required in instances where, as here, there are differing periodic rates. This point is restated in Comment 9 of that same subsection. "[I]f a plan involves purchases and cash advances that are subject to different rates, more than one balance must be disclosed even though the same computation method is used for de-

termining the balance for each feature." Official Staff Interpretation to 12 C.F.R. § 226.7(e), comments 4 and 9 (1998).

I am satisfied that there is ample evidence that the terminated line of credit with SRC and the future line of credit with SNC were two separate and distinct accounts. The evidence suggests that SRC was the servicer or collection agent for the SRC account and the SNB account. (Exhibit Nos. 22, 23.) Notwithstanding the fact that both accounts were being serviced by SRC, the accounts bore different interest rates and credit was extended by different corporations. As earlier indicated, when SRC terminated the obligors' line of credit on May 1, 1995 without a written agreement with the obligor, Regulation Z required that the account continue to be treated as an open-end account until the balance was paid. Official Staff Interpretation to 12 C.F.R. § 226.5(b)(2)(i), comment 2 (1998).

Having found the existence of two separate accounts, multiple deviations from the requirements of TILA become apparent.[5]

A review of the Derienzio account, (Exhibit No. 24), indicates that the account summary carried the "Average Daily Balance" for the SRC account and the SNB account but not the outstanding balance at either the beginning or the end of the statement period. The statement apparently totaled the SRC and SNB accounts to provide a combined "Average Daily Balance" for the two accounts. (Exhibit No. 24.)

While the statement does indicate that a credit was applied, it does not indicate whether it was credited to the SRC account or the SNB account. One would have to reference the initial disclosure statement to ascertain that the oldest charges (and presumably the interest accumulated on those charges) would be paid

prior to the newer charges and the interest on those newer charges.

After adding the finance charge accrued to each account, the statement indicates a total average balance for the accounts, again without articulating how this balance was apportioned between the SRC account and the SNB account.

Finally, there is an address where billing inquiries can be sent. Unlike other required information, Regulation Z does allow a servicer to maintain multiple accounts. Accordingly, this address appears to be adequate.

In summary, having found that there exists two separate and distinct accounts, it is apparent that the Trustee's Complaint against SRC and SNB is well taken in regard to three specific violations of 15 U.S.C. § 1637(b), inasmuch as the Defendants have not set forth in their periodic statement (1) the outstanding balance in each account at the beginning of the statement period; (2) the total amount credited to each account during the period; and (3) the outstanding balance in each account at the end of the period.

Having made these findings of fact, I must follow with the conclusion of law that the Trustee is awarded summary judgment with regard to Count Two of his Complaint for Truth in Lending violations against the Defendants, SRC and SNB, and the Defendants are denied summary judgment on their motion.

*Consumer Protection Law-(Count Three)*

 The purpose of the Unfair Trade Practices and Consumer Protection Law (Consumer Protection Law) "is to protect the public from fraud and unfair or deceptive business practices." *Keller v. Volkswagen of America, Inc.*, 733 A.2d 642, 646 (Pa.Super.1999) (citing *Johnson v. Hyun-*

---

5. This is true despite the fact that even should the SRC and SNB obligations be considered part of a single credit plan, a single initial disclosure statement can be justified or, for that matter, be required. 12 C.F.R. § 226.5(d) (1998). Notwithstanding compliance by SRC and SNB with the requirements in making the initial disclosure statement, the periodic statements fall far short of the necessary disclosures set forth in § 1637(b).

**344**

*dai Motor America,* 698 A.2d 631, 638 (Pa.Super.1997)). The applicable portion of the statute reads, as follows:

> Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.

73 Pa.C.S.A. § 201–9.2(a)

■■■■ A cause of action under the Consumer Protection Law can be brought by either the government or a private individual and "[i]t is to be liberally construed in order to effectuate its purpose." *Keller,* 733 A.2d at 646. For a private individual to bring a cause of action under the Consumer Protection Law four criteria must be established:

> 1) that he or she is a purchaser or lessee; 2) that the transaction is dealing with 'goods or services', 3) that the good or service was primarily for personal, family, or household purposes; and 4) that he or she suffered damages arising from the purchase or lease of goods or services.

*Id.*

■■■■ In the Complaint at Count Three, paragraphs thirty-six (36) to thirty-nine (39), the Trustee alleges a violation of the Consumer Protection Law. Paragraph six (6) of the Complaint avers "[o]n various occasions, the Defendant Sears, sold the Debtors, who are consumers, quantities of personal and family household goods pursuant to a revolving charge account with the Debtors, retaining a security interest in the personalty sold." Specifically, at paragraph thirty-six (36), the Trustee alleges "[t]he Defendant's [sic] action of providing credit to induce purchases of goods and services directly relate [sic] trade and/or commerce within the definitions of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ... and directly and indirectly affect the people of this Commonwealth." Affidavits from Robert Mishler and Kevin Walsh, parties in two of the four lead cases that were consolidated by Stipulation, indicate that they used their Sears accounts to purchase "personal and family household goods from Sears[.]" (Affidavit of Robert A. Mishler at 1; Affidavit of Kevin J. Walsh at 1.)

■■■■ It is at this juncture that I am met with the absence of any indication on the record that the Debtors or the Trustee have suffered a loss by reason of the Defendants' conduct. The statute "requires an ascertainable loss of money or property." *Krisa v. Equitable Life Assurance Society,* 109 F.Supp.2d 316 at n. 5 (M.D.Pa.2000).

Moreover, there must be a causal connection between the Defendants' conduct and the Plaintiff's loss. *Weinberg v. Sun Co., Inc.,* 740 A.2d 1152, 1168 (Pa.Super.1999).

In an effort to determine whether the element of damage was bifurcated from the current issues, the Court has examined the Stipulation and has found that only the "amount" of damages was deferred to a later proceeding. (Stipulation at 8.c.)

Without some evidence of a loss, the Trustee's multiple examples of confusion created by the Defendants certainly suggests that they are insensitive entities, but these facts alone are insufficient to generate a cause of action under the Consumer Protection Law.

Taking into consideration "the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits" in the light most favorable to the non-moving party, I find as follows concerning the motion and cross-motion before me pertaining to the Consumer Protection Law.

- Defendants' Motion for Summary Judgment on Count Three of the Trustee's Complaint alleging a violation under the Pennsylvania Unfair Trade Practices and Consumer Protection Law is granted.
- Trustee's Cross–Motion for Summary Judgment on Count Three of the Trustee's Complaint alleging a violation under the Pennsylvania Unfair Trade Practices and Consumer Protection Law under 73 P.S. § 201–2(4)(iii) and (xvii) is denied.

### Plain Language Consumer Contract Act-(Count Four)

Neither the Defendants in their Motion for Summary Judgment, nor the Trustee's Cross–Motion for Summary Judgment raise a genuine issue of material fact concerning the Pennsylvania Plain Language Consumer Contract Act, and thus, Count Four of the Trustee's Complaint will be decided as a matter of law.

The Pennsylvania Plain Language Consumer Contract Act (Consumer Contract Act) was enacted by the Commonwealth of Pennsylvania Legislature because of a need to make consumer contracts easier to understand. 73 P.S. § 2202(a) (West Supp.1999–2000). Specifically, "[b]y passing this act, the General Assembly wants to promote the writing of consumer contracts in plain language. This act will protect consumers from making contracts that they do not understand. It will help consumers to know better their rights and duties under those contracts." § 2202(b). Furthermore, "[t]his act shall be liberally interpreted to protect consumers." § 2204(c).

█ In the Complaint, Trustee alleges that the notice sent by SRC in the March 1995 billing statement by its terms was a contract between the Defendants and various consumers that changed the original credit agreement. (Complaint at ¶¶ 40–44.) The Trustee further alleges that "[t]he aforementioned Notice does not comply with the Pennsylvania Plain Language Consumer Contract Act, especially as to the differentiation between creditors, how payments are applied and the plain language to allow consumers to better understand their rights and know their duties to allocate payments." (Complaint at ¶ 47.) Therefore, "[s]aid Notice and each and every billing statement issued thereafter did not comply with the terms and conditions of a credit agreement." (Complaint at ¶ 48.)

Debtors Robert Mishler and Kevin Walsh, in their Affidavits, indicated they used their Sears accounts to purchase "personal and family household goods from Sears[.]" (Affidavit of Robert A. Mishler at 1; Affidavit of Kevin J. Walsh at 1.) Under § 2203, these Debtors are considered consumers because each is an "individual who borrows, buys, leases, or obtains credit, money services or property under a consumer contract."

The next question is whether the notice and monthly billing statements are considered "consumer contract[s]" or "contract[s]" under the Act by definition as

[a] written agreement between a consumer and a party acting in the usual course of business, made primarily for personal, family or household purposes in which a consumer does any of the following: (1)[b]orrows money[;] (2)[b]uys, leases or rents personal property, real property, or services for cash or on credit[;] (3)[o]btains credit.

§ 2203.

The notice consisted of ten reduced pages that created a folding type document and contained two sections. The first four pages were titled "*SEARS* **IMPORTANT NOTICE FOR SEARSCHARGE CUSTOMERS IN THE STATES OF MA, ME, PA, RI AND WV CHANGE IN CREDIT TERMS.**" This first section

outlined the changes to the SearsCharge account after May 1, 1995 when SNB would become the new creditor. The last bolded paragraph on page four informed the consumer that "**Use of the Card is Acceptance of Changes** [:] If you or anyone authorized by you uses the account after the effective date of these changes, you will have accepted and agreed to all the changes included in this notice." Therefore, the Sears Card account and Security Agreement with SNB as the creditor would only become effective upon acceptance by the customer evidenced by authorized card use. This first section of the notice is not a contract under the Act because it merely informs the consumer of the new terms.

The second section of the notice was titled "**SEARS NATIONAL BANK SEARS CARD ACCOUNT AND SECURITY AGREEMENT.**" When accepted by the consumer, the Defendants maintain that the agreement became a valid contract between the consumer and SNB as the creditor.

■ The Trustee also alleges that the monthly billing statements violate the Act.

The Consumer Contract Act "applies to all contracts that are made, solicited or intended to be performed in this Commonwealth after the effective date of this act." § 2204(a). This Act, however, does not apply to "(5) [d]ocuments used by financial institutions, which financial institutions are subject to examination or other supervision by Federal or State regulatory authorities, or documents used by affiliates or service corporations of such financial institutions." § 2204(b). The monthly billing statements do not meet the definition of a contract under § 2203 of the Act because the statements are a vehicle used to inform the consumer about the status of their account pertaining to a contract that they have already entered into.

While the statute does not define "financial institution," the following is found in Black's Law dictionary:

Financial institutions. An insured bank; a commercial bank or trust company; a private banker; an agency or branch of a foreign bank in the United States; an insured institution as defined in the National Housing Act; a thrift institution; a broker or dealer registered with the Securities and exchange Commission; a broker or dealer in securities or commodities; an investment banker or investment company; a currency exchange; an issuer, redeemer, or cashier of travelers' checks, checks, money orders, or similar instruments; an operator of a credit card system; an insurance company; a dealer in precious metals, stones, or jewels; a pawnbroker; a loan finance company; a travel agency; a licensed sender of money; a telegraph company.

Blacks Law Dictionary 630–31 (6th ed.1990); 31 U.S.C.A. § 5312; see also Uniform Probate Code, § 6–101(3).

■ The contract formed here is between the consumer and SNB as a creditor. Paragraph four (4) of the Trustee's Complaint alleges that "[t]he Defendant, **Sears National Bank** ..., is a national financial institution, which has been designated as a limited service bank by the United States Office of the Currency Comptroller, with offices located at 4605 East Elwood Street, Suite 700, Phoenix, Arizona 85040." In the Amended Answer of Defendants SRC and SNB, Defendants admit that "SNB is a national bank chartered by the Office of the Comptroller of the Currency as a limited purpose bank. Defendants affirmatively state that SNB's headquarters are located at 2626 South Hardy, Tempe, Arizona 85282–1916." Because it is a national bank, the Trustee's action under the Pennsylvania Plain language Consumer Contract Act is not applicable to SNB under § 2204(b)(5).

● Defendants' Motion for Summary Judgment on Count Four of the Trustee's Complaint alleging a violation of the Plain Language Consumer Contract Act of the Commonwealth of

Pennsylvania, 73 P.S. § 2201 is granted as a matter of law because the first section of the notice sent by SRC, is not a "consumer contract" or "contract" under the Act; SNB is excluded from the Act concerning any "consumer contract" or "contract" made under the Act pursuant to § 2204(b)(5); and the monthly billing statements are not considered "consumer contract[s]" or "contract[s]" under the Act.

• Trustee's Cross–Motion for Summary Judgment on Count Four of the Trustee's Complaint alleging a violation of the Plain Language Consumer Contract Act of the Commonwealth of Pennsylvania, 73 P.S. § 2201 is denied.

Having found that the Trustee is entitled to summary judgment on the Truth in Lending Count (Count Two), it is incumbent on the Court to proceed with a determination of damages. By the terms of the parties' Stipulation of May 12, 1998, Plaintiff and Defendants are now permitted to present evidence "to support or defend their respective positions." (Stipulation at 4.) For that purpose, the Court sets TRIAL to begin on *Monday, February 5, 2001*, at *9:30* o'clock A.M. in Courtroom No. 2, Max Rosenn U.S. Courthouse, 197 South Main Street, Wilkes–Barre, Pennsylvania, and continue on *Tuesday, February 6, 2001*, at *9:30* o'clock A.M., and *Wednesday, February 7, 2001*, at *9:30* o'clock A.M., if necessary.

Consistent with this Opinion, the Court further sets TRIAL on that same date and time on Count One (lien status).